Mr. Berry. Good morning. For the first time, the SEC has blessed a proposal that facially discriminates based on race and sex. NASDAQ proposed its rule for the express purpose of getting board seats and investment capital allocated on the basis of race, sex, and sexual orientation of its directors. The stated purpose is, quote, the diversity imperative for corporate boards. NASDAQ listed companies have to meet its race and sex numbers or else make a public statement why not. The unrebutted expert evidence in the record and common sense demonstrate that this duty to explain creates litigation, reputation, and other risk that encourages companies to discriminate. And NASDAQ is forcing speech on these controversial identity politics categories, categories the in striking down university affirmative action programs. So now we have a quota enforced by compelled controversial speech. This is two constitutional wrongs and there's nothing right here. I'd like to speak briefly to an issue that's come up quite a bit in the briefing, which is exactly how the SEC's order triggers obligations under the Exchange Act, under federal law. The Exchange Act now requires, by virtue of the SEC's order, the NASDAQ Stock Exchange to comply with its own standards. And it's also required to police its members, that is, its broker dealers, their compliance with these listing standards as well. Under the Act, policing its brokers is precisely how NASDAQ enforces full compliance with these quotas. If an issuer doesn't comply, NASDAQ has to delist and it has to make sure that its member broker dealers don't trade in unregistered securities. And finally, in the background, if NASDAQ drops the ball in any way, the SEC is now authorized by federal law, by the Exchange Act, to enforce NASDAQ's compliance with its own rules. This imposition of federal obligations, backed by the threat of federal enforcement, constitutes state action under the Moose Lodge case, triggering the Constitution's protections. In this pre-enforcement case, the proper relief would be to vacate the SEC's order in order to vindicate those constitutional protections. The last part I'd like to call especially to the Court's attention is that because any SEC enforcement action would itself be unconstitutional, because that order would be encouraging discrimination and compelling controversial speech, the rule is also not consistent with the requirements of the Exchange Act, because it would make a portion of the statutory scheme unconstitutional as to this rule. So as a pure statutory matter, it was inappropriate for the Commission to authorize this rule. Counsel, could I ask, just really, I'm interested in your theory, how you would propose that we write this rule, and I think he's waiting, you waived on it, correct? Yes. And specifically, how far would we be putting the SEC into making investor decisions and say Goldman Sachs or Vanguard as to what information they can want to invest trillions of dollars? So here are the two hypotheses. Would it be arbitrary and capricious for the SEC to approve of a similar rule that wanted to know if board members have an ESG focus, a set of profit maximization? That's one. And would it be arbitrary and capricious for the SEC to approve of investors' similar disclosure rule, what are the final degrees of board members? Do they go to Ivy League schools, did they, and therefore they may not have profit maximization? How far does the SEC have to make the business decisions and come in, and do they have to interrogate the motives of investors like the Chamber of Commerce as to what information they want to put into their algorithms? So this is, Your Honor, this is not a case where we have, where the court needs to go searching under the hood, because like right, the hood ornament is discrimination. The diversity imperative for corporate boards is what NASDAQ says, that's the very first heading of their substantive proposal. I think for the proposals or the hypotheticals of Judge Higginson that you suggested, the rule is going to promote efficiency, competition, and capital formation, that's the basic most obligation, and then it goes through the review factors layout in 78FB5, the ones that take a lot of time up in the briefing here. And for some of those, there is going to be, there is potentially an investor protection, not investor demand, like investor demand is not the statutory predicate, investor protection is the rationale, and possibly, I mean these days I question it, but possibly the attainment of a degree from the Ivy League is material, probably not, but some of that's personal experience. I'll ask some other questions. How could we say it's arbitrary and capricious here, if the EEOC is asking for similar race, gender, demographic data as to employees, if the EEOC has its own policy about diversity, and if the EEOC, I'm sorry, if the SEC approved arrival exchanges similar rule, the long-term stock exchange, how could we say here, SROs, if we don't consider them to be state actors, what you're proposing is arbitrary, it would be arbitrary and capricious to approve it, but in those circumstances, even the federal government can ask for that data. So, one major distinction, of course, between the SEC and the EEOC is EEOC's entire ambit is anti-discrimination in the employment context. Separately, the EEO1 form, the main form by which the EEOC compels those disclosures, is actually protected from public disclosure, that is, I believe there are, in fact, criminal sanctions against those who publish the EEO1 or make that sort of information available, so that's a very different rationale under a very different scheme. Here, we don't have that. Here, instead, the entire stated purpose is the allocation either by companies directly of board seats on the basis of race and sex and sexual orientation, or the allocation of capital by investors for those same purposes. Those are not purposes cognizable under the Exchange Act, as we explain, as our co-petitioners explain, as well. Would it be okay if the rule just merely required the disclosure without the threshold or the recruitment help that's offered as part of the rule? So, I think that it would be, and I'll take the hypothetical one further, Judge Wilson, and assume you're also excluding the selective comply or explain components. We've got two main components, the diversity matrix disclosure, and then if the issuer fails to meet the substantive quotas, you've got to have a minority director, you've got to have a woman director, you must also issue some sort of public explanation. I do think that would be a harder case than the one we actually have in front of us, but the fact would remain, presumably, that NASDAQ's purpose would still be to encourage discrimination along these favored race and sex lines. It would force disclosure of that information so that companies who don't get with the program, so to speak, would be under pressure from all sorts of sources, including in asset managers like State Street, one of the very largest asset managers in the country, which in this record has said, we are doing, we support this to promote diversity and inclusion on corporate boards. Mr. Berry, what would you say to someone who said, because this is a facial challenge and the SEC hasn't yet stepped in to enforce, that there isn't sufficient government action? So, Judge Elrod, what I would say there is that right now, by operation of the Exchange Act, there is a live federal law obligation on NASDAQ to comply with its own rules. So that's Section 78SG1 and an obligation to enforce broker-dealers' compliance with those. There's a live obligation right now, and the SEC is authorized to enforce. As in Moose Lodge, Moose Lodge had no, Moose Lodge was also a pre-enforcement case. There was no live or pending or even threatened, as far as we can tell, enforcement action in that case. The simple fact of this private organization's rules by law were required to be enforced, the organization was required to enforce its own rules, that was sufficient for the Supreme Court to hold in Moose Lodge. Would it matter if the SEC said, we're not going to enforce this rule, it's a hot potato and we don't want to touch it? Well, then I think it would, that may complicate the state action aspect, possibly, but it would make the Exchange Act portion of this very easy, because there, what better evidence could there be that this rule is not consistent with the purposes of the Exchange Act? What do you say about the justification the SEC used that various investor groups had required this, requested this information because it was too difficult for them to obtain? I can't believe that, but anyway, that that popular demand justifies SEC approving a disclosure rule like this. So what I would say there is that demand by certain investors for information outside of the cognizable purposes of the Exchange Act is not even competent evidence. Additionally, we look at what Judge Ginsburg said in the second business roundtable case where the commission is obligated to look through special interests or special motivations that are outside of the scope of what the laws look at, and we have that in many cases with these asset managers, all sorts of evidence that this is information being collected not for profit-seeking, but for the sake of discrimination. Not that profit-seeking through race discrimination would ever be appropriate. Do we reach the First Amendment issues if we find that the Securities and Exchange Act does not cover a regulation like this? Not, likely not. It depends on how the court were to choose to write this, but if the court were simply to conclude that the kinds of discrimination being sought here are outside of the purposes of the Exchange Act, the court would not need to opine on either the First or the Fifth Amendment. Do you think that would be a valid rationale? For the court's decision? Yes. Yes. Thank you, counsel. Thank you. May it please the Court, I'm Margaret Little of New Civil Liberties Alliance for Petitioner National Center for Public Policy Research. The Exchange Act expressly forbids the SEC from approving these rules. Section 65 of the statute provides that SEC must not approve exchange rules that are designed to regulate matters not related to the purposes of the Act or the administration of the exchange. When, as here, an agency adopts exchange rules which extend into unrelated and socially controversial matters, it violates that express provision by Congress. And when Congress has said an agency may go thus far and no further, courts must call the out of bounds. The second point I would like to address today is that the board diversity rules compel speech by requiring companies to explain why they have not met the two assignments of board sheets under these rules. Under any standard of review, that compelled explanation violates the First Amendment. I invite the Court's questions. When you say the rule would be that the SEC gets to determine for the private sector what's so that asset managers can't ask for that information, what I noticed was it's uncontested, the SEC's finding. They made the conclusion this is information a huge variety of investors want. And so I read with interest your reply brief to the en banc which says, quote, because there's no substantial evidence that board diversity increases investment returns, the diversity rules disclosure requirement falls outside the Act's investor protection purpose and thus may not be approved. I'm wondering again, what's the legal rule? Does the SEC now have to agree that information will make investors money? Does the SEC get to decide what's a good business decision? Not at all, Your Honor. What the SEC must decide, and it's not that it gets to decide, it must decide, does this proposed rule of the exchange fall within the purposes of the Act? And these rules, which are both very socially controversial and unaddressed by any purpose in the statute, cannot be approved by the SEC under 65. And you heard my two hypotheticals. Let's say investors disagree and they say it's vital for us to be able to put into our complex modeling that board members are ESG focused or that they went to certain universities. We would be saying that's arbitrary and capricious. The government's going to tell those investors, you can't think about that. You can't ask for that information. Well, I agree with my co-counsel that the Ivy League requirements seem sort of counterintuitive to me, but any schooling disclosure of that nature would as well. So the SEC is not in the business of doing research for large investors, institutional investors, or even retail investors. That's not its job. Its job is to approve or allow rules that fall within the purposes of the Act, and neither of your hypotheticals did. Moving to the first question. What do you say to people who would say that the information is not controversial? That was one of your points, that it was indeed controversial and would require strict scrutiny because of that. Right. No, these are very socially controversial. Right. It's controversial. So can you elaborate? Sure. DEI is one of the biggest controversies going on. You cannot pick up a newspaper today without having people very concerned about DEI, very defensive in trying to protect DEI. This is an ongoing, powerful debate in our society, which is fine. But the SEC should not be taking sides in this debate. Well, controversial, not controversial. Aren't these findings of facts by the agency? I mean, how strongly do we defer to those? Well, there were certainly no findings by the agency that this sort of rule in any way improves stock performance. The SEC admitted that it was either mixed or generally inconclusive. Well, but again, back to Judge Higginson's point, does it all have to be profit-driven or, you know, up or down in terms of stock value? Or are there other values that the SEC can find are worthwhile or covered by the act? The SEC is limited to investor protection in the various criteria, and there are four of them in the rule. And I'd be happy to show, I think, how the structure of 65 answers your question. There are four requirements that the affirmative purposes for exchange rules. Two of them are very congruent with the SEC's own limitations. And the first one is to prevent fraudulent and manipulative acts and practices. Obviously, these rules do not fall within that. And also to protect investors and the public interest, and they do not fall within that. And in addition, Section 78M of the Securities Exchange Act has an even more powerful limitation on the SEC's own power to demand disclosures. Section 78 makes those demands for disclosures only as necessary or appropriate for the proper protection of investors and to ensure fair dealing in the securities. That's a SEC's own limitation. Now, there are two more rules that do fall under 65 that are affirmative purposes of the act. One is to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaging in regulating, clearing, settling, processing information with respect to and facilitating transactions in securities. In other words, this is what exchanges do. The SEC doesn't set up trading mechanisms or figure out when it is a trade must clear in order to be fair to other investors or other market participants. But, I mean, again, it's back to just the endless list of hypotheticals. Our Court isn't normally one that is empowering the SEC to be interrogating investor motives. So I just, I'm wondering what the rule is. Let, why won't we let the market and private investors, hedge funds, decide it's relevant to know if there's a peace activist on the board because that person might not favor fossil fuels, or it's relevant to know if they're against the Gaza war. That's a politically controversial topic, but investors get to decide if that's going to go into their factor, not the SEC, into their calculations. The SEC is going to say, you can't know that information. It's controversial. I completely disagree with the premise of this question. The SEC is not empowered under these sets of statutes to make such disclosures required of any. No, but you're asking us to say it was arbitrary and capricious on these facts to ask about this category of information. And I'm saying it would apply to so much that trillions of dollars are being invested on. People with money want to know what the people that are in the corporate boardroom are likely to do. People with money are very, very interested in what companies invest in Israel or what ESG initiatives. Those are not something the SEC can tell. Those are very contentious public issues, and none of them have to do with the purposes under which. OK, so you are saying the SEC will have to step in each time in exchange. Investors universally ask for relevant information. They think it is. We are going to say courts in the SEC are going to say no. No, it just doesn't. It should not. Does the SEC regulate investors? Does the SEC regulate investors? Does it regulate proxy advice companies in what they can request from issuers? Obviously not. Does it regulate the proposals and queries that shareholders can bring before the board in regard to the election of directors or what goes into the quarterly and annual financial statements? I mean, obviously it regulates the financials, but I'm talking about the election process of shareholder, what do you call them, questions and proposals and director votes. And that's the proper form for these issues. And when they vote on directors, there's always a little praise about the qualifications of the directors if they're not. That's true. So this is not information. The distinction here is between the SEC allowing NASDAQ to require this quota or disclosure on the one hand or investors or issuers reacting to investors voluntarily on the other. That is correct, Your Honor. This information will be readily available through those mechanisms. What the SEC did not do is allow an exchange to set forth rules that address those controversies. Ms. Little, over here. I'd like to understand your answer to some of Judge Higginson's hypotheticals. If NASDAQ required a company to disclose how many of its board members supported Israel's actions in Gaza right now, in your view, would that be arbitrary and capricious? Yes. And just to understand, you said something about, well, it would be controversial. No doubt that would be controversial. But I understood your answer to be it would be arbitrary and capricious because how many board members support Israel's actions in Gaza has nothing to do, nothing to do with the purposes of the exchange set forth in whatever it is, 6B5, 6B5. Precisely. And so if the SEC, if NASDAQ also said, we'd like to know how many Zionists you have on your board, that would also be arbitrary and capricious, in your view, or not? It would. And in fact, in 1935, after the Exchange Act was set up, or even in 1976, after it was amended to add little 6B5, I also think that any kind of rule asking companies at the condition of being listed on the exchange to disclose how many homosexuals they have on their board, how many women they have on their board, how many minorities, that would be deeply offensive. But offensive or not, we're testing whether it's within the purposes of the exchange. I mean, I'm offended by everything 15 times a day. But it's within the purpose of the act. You know, a court would not be called on to sort of gauge how offensive or how controversial it is. Yes, that's true. But it certainly does not fall within the purposes of the act. Thank you, Chair, for your time. Thank you. May it please the Court, Tracy Harden of the Americas Securities and Exchange Commission. I want to start by addressing a few premises that underlie the arguments we've heard so far this morning. And I think, first and foremost, the petitions are starting in the wrong place here. As has been true of stock exchanges since almost the time of the founding, NASDAQ is a privately operated market. And the listing of companies' stock on its exchange is a matter of contractual agreement. Can you get a little bit closer to the microphone? Is that better, Your Honor? Just speak dog loud. Yeah, just speak into it. It's not the mic. Dog loud. Okay. How about this? Is that better? Yes. Okay. So the question before the Court, as it was before the Commission, is not whether there's a specific authorization from Congress for NASDAQ to propose these particular listing standards. It's whether the standards fall within the limitations Congress placed on that private enterprise in the Exchange Act. And the Commission reasonably concluded that they do. This is far afield from the approval of disclosure of the information merely because some group of investors want it. The record includes comments from institutional investors, investment managers, and individual investors representing trillions of dollars in investment, all saying in various forms that they consider board diversity information a key marker of good corporate governance that leads to good corporate outcomes. This supports the determination that making widely available, consistent, comparable disclosure of that information promotes the applicable market-based and investor protection criteria in Section 65. And any other disclosure proposed by an exchange, including the hypotheticals that have been discussed so far this morning, would have to be similarly supported by evidence demonstrating consistency with one of those factors. It would also have to be consistent, as these rules are, with the prohibitions on unfair discrimination between issuers and 68, which really balances the competitive burden of disclosure requirement against the degree to which it furthers the purposes of the Act. The Commission here is not disputing that there must be relevance to investors' decisions to buy, hold, sell, or vote their securities. What we're pushing back on is the petitioner's notion that that's limited to specific financial or economic metrics. And that disclosure information like this that investors use and reasonably consider as a marker of value is certainly related to the Act's core disclosure purposes. Nor are these rules state action. NASAC, again, is a private for-profit entity that's part of a publicly traded company. And listing standards, again, are a matter of contract between the exchange and its issuers. They're not enforced by the Commission. I push back on that notion from the petitioners this morning. And if companies do not wish to comply, they can list elsewhere. There are four exchanges with listing issuers. There are nine exchanges with listing rules. There are options here. And the petitioner's contention that the Commission's approval is enough to find that these rules are state action is contradicted by decades of law from the Supreme Court and this Court. It says that government approval of an action where it has not put its thumb on the scale, where it is not involved in the decision-making, is not state action. The Alliance attempts to bootstrap separate provisions of the Act requiring exchanges to follow their own rules into a reason to find state action here. But the Supreme Court actually rejected that in this slide where it left the private rules in place despite the presence of the state requirement for enforcement. To find state action in these circumstances would be not only to split the decisions of five other circuits, but it would upend the settled expectations and functioning of the system that's governed the securities markets for almost 100 years. And it would unduly expand state action doctrine to constrain individual liberty and private enterprise. And at bottom, reasonable minds may disagree, as the petitioners do, with NABDAC's decision to differentiate itself from its competitors by requiring listed issuers to make these disclosures. But that disagreement doesn't provide a legal basis to overturn NABDAC's business judgment. And it did not provide a basis for the commission to find inconsistency with the Act. The constitutional limitations that apply to the exercise of governmental power should not be extended to constrain this private decision. The NABDAC's rules are consistent with the Exchange Act. I welcome the Court's question. Counsel, I have several questions, but the first couple are yes and no. You agree that the approval order stands or falls on Section 65. That's the only thing that's mentioned in the approval order as a statutory authorization for the SEC to approve the NABDAC rule. Well, actually, Section 19b sort of works us into Section 65. And there's also Section 68, which is discussed at length. And that is the provision I was referring to that requires a balancing of the burden on competition against the degree to which something furthers the purposes of the Act. But you agree that we don't even get to any of the rest of this case if we can't find something in Section 65 that justifies the diversity rule? That's correct, Your Honor. The rule has to be consistent with the applicable provisions. Perfect. So that's why you talked this morning so much about whether it promotes free and open markets and whether it's investor protection or principles of fair trade, the things that are mentioned in Section 65. That's correct. So here's where I'm hung up. You're not talking about the umbrella clause in Section 65, which says, an exchange shall not be registered as a national securities exchange unless the Commission determines that, and then it meets a bunch of things, including Section 65. So how in the world can the SEC continue to register the New York Stock Exchange in the absence of a diversity rule applicable to that exchange? I'm not sure I understand the inconsistency. Let's unpack it. So there's no diversity rule on the NYSE, right? That's correct. And that's your whole point about, oh, this is just private ordering and everybody can compete and do whatever they want. The New York Stock Exchange doesn't have a diversity rule. That's correct. But there's nothing in this order that says such a rule is necessary. And actually, it is in the statute. You say, well, there's nothing in the statutory basis. And this is what I'm hung up on. The statute specifically says, an exchange shall not be registered as a national exchange unless the Commission determines that it has the requirements of Section 65. And you say, oh, well, the diversity rule, that is a thing, right, that meets all of these various components and promotes open markets, et cetera, et cetera, et cetera. And that's why we're authorizing it, because it is a national security. The Commission has determined that it meets 65. But the other exchanges don't have it. So how can you register the other exchanges? I think the missing piece, Your Honor, is Section 19b, which has to do with amendments to exchange rules. And that was the governing provision here. This was a proposal by NASSAC that was submitted to the Commission. And under the 19b, when the Commission is looking at amendments to rules, it looks at whether they are consistent with the applicable provisions of the Act. Well, you now have a big problem under Chenery, right? Because the thing, you brought us a rule, or, I guess, more specifically, the appellants brought us a rule that has an approval order. It's an 82-page approval order. And the way that you've explained the approval order in the approval order is you think that the diversity rule meets the requirements of Section 65. That's what it says, right? And you say, oh, it's a disclosure framework, and it's free and open markets and investor protection. Investors want it. And so if that's the basis that you gave in the approval order, you can't shift horses now. Now you have to say, well, we actually think that this diversity rule is promoting the various requirements of 65. But, Your Honor, I want to push back on that, because the Commission very clearly in the approval order found consistency with the factors in Section 65. Not that this rule was necessary for an exchange to meet those factors. And that's very clear in the order. Let's go a little narrower than Judge Oldham's hypothetical. And that is, if it is consistent with the purposes of the Act, why couldn't the SEC just embody it in a rule? Well, I think that the standards applicable to Commission rules are different from the standards applicable to exchange rules. Yes, I know there's a tradition for the SEC not to impose substantive governance standards. But why couldn't the SEC impose a rule? I mean, the SEC itself found that this had no connection to the performance of these stocks in the marketplace. But if it's consistent with the purposes, why couldn't the SEC, just like the Israel deal, require issuers to announce the diversity of their board members? A few things, Your Honor. First, I would push back very strongly on the notion that the Commission found there was no connection to corporate performance here. That's just a mischaracterization of petitioners' views of the Commission's order. I didn't rely on that. It did not. NASDAQ asserted that, and the SEC did not rely on it. That's true, Your Honor. But what the Commission said was, in light of the disclosure benefits, and I'm quoting here, that the board diversity proposal would provide, and given that the studies of the effects of board diversity are generally inconclusive, and the costs of the proposal are likely to be comparatively limited, the Commission finds that the board diversity proposal is consistent with the act. That's not a rejection of the study showing a positive- It's not a recruited endorsement, is it? No, Your Honor, but what the Commission pointed to is that there's a reasonable basis here. That makes my point even stronger, because if the Commission buys that theory, then why couldn't the Commission make that a mandatory disclosure? I think two things, Your Honor. One, of course, the Commission's rulemaking is not at issue here. This is an exchange rule. But also, I think the analysis would be very different, right? This is an exchange rule that applies to listed issuers on one exchange. Again, it's not market-wide. But what if it's consistent with the purposes of the act? SEC could do exactly the same rulemaking, and oh, by the way, you have six months to do it, and Mr. Kensler is very aggressive, and say, from now on, we find the purposes of the act identified in Section 78 go beyond investor protection, beyond fraud protection, beyond the regular working of the market, to basically whatever the SEC says. Your Honor, this order provides no precedent for that kind of rulemaking. The Commission very clearly found a relation to... You mean that there are big arguments right now about the ESG rule pending in the Eighth Circuit? There are, Your Honor, but again, that's a Commission rule. And the Commission and the Commission here very specifically found that this was connected to the affirmative factors in 65 that go to a competitive marketplace. Is there anything that would, put another way, since you're not answering my question, is there anything that would prevent the SEC from requiring public disclosure of the diversity of board members and, you know, whoever else they wanted to within the organization? Your Honor, there are certainly limits in the act on the scope of the Commission's rulemaking authority, but that rulemaking would be also be state action in a way that this is not. Because, again, we had a private exchange that independently developed this rule, and all the Commission is determining here is that it's within the bounds that Congress drew for that kind of private action. Well, I have a question about the bounds. The bounds. Under your reading of the statute, could the SEC approve a rule that regulates something that seems unrelated or incredibly tangential to the stock market as long as the market asks for it and it doesn't promote unfair trading practices and the public is very interested in it? Like, could they ask what the members' views of whether they're on Team Drake or on Team Kendrick Lamar, which is something the public's very interested in. Is there a limit anywhere? And that's not clear to me here. There are limits, Your Honor, and I think they're both practical limits, of course, on what an exchange would impose on its solicitors. What is the limit that applies here? Right, there are statutory limits in Section 6b-5 that do real work here, right? There is, of course, the relation to the act, which we do not contest, requires a reasonable relevance to investor decision-making to buy, sell, hold, or vote their securities. Also, there would have to be a record establishing consistency with one of the affirmative market-based criteria. Here, there's substantial evidence determining not only that investors want this information, but they use it in their decision-making and do so because they believe it leads to better corporate outcomes and is a matter of corporate value. So if they said that they would do that about which musical preferences or rules or who was fair or not in those, if they said that was what they could base it, or if you like Taylor Swift, that's going to base your whole life on whether or not that's a good business because anything she supports grows. Could you do that? Again, the further factors in 6b-8 would, or I'm sorry, 6b-5 and 6b-8, would come into play. If there's really not a reasonable basis for investors to want this for investment decision-making... It's a basis, a reasonable basis is whatever the SEC says. Yeah, that's a reasonable basis because investors want it. No, Your Honor. That's not correct because there is a very robust administrative record here saying not just that investors want it, but they want it because they believe it leads to good corporate value and there is support for that notion in the empirical evidence. So this is a reasonable, rational determination by the market that this is important information for investor decision-making. You would need that kind of record for any exchange... Wouldn't it be more reasonable and certainly more relevant? Could the SEC require under the act a disclosure that all corporate board members had the integrity and character to have fidelity to their spouse? Would that be something? I mean, that would be a good corporate governance thing to know that they had no domestic incidents or how far do we go with this? I mean, putting aside the hyperbole, that would seem to be something that would show character and trustworthiness, right? Well, a couple of things. First, of course, I repeat, the commission is not requiring this. This is an exchange business decision. But beyond that, again, I think the factors of unfair discrimination between issuers and the balancing of the degree on competitive burden imposed by the disclosure requirement against the degree to which it furthers the purposes of the act really does work here in those hypotheticals. I hate to interrupt, but a lot of the questions that have come from the court have pertained to where do we draw the line on this? Where do we find that it's relevant or not? And if the answer is investors want it, then that's not really a line at all. Then we get into the Taylor Swift territory. I'm trying to figure out where to draw the line. For instance, just to get back to the facts of this case, what does a person's sexual orientation have to do with the prevention of speculation or manipulation of securities markets to promote accurate stock prices, to prevent fraud, to protect investors in the corporate suffrage, and to promote exchange competition? Your Honor, this rule was designed by the exchange because there is a rational, supported belief in the market that diversity of voices in the boardroom leads to better corporate decision-making. Where can I find that? I understand that that's your argument, and a lot of people may think that, but where can I find that to support the use of the Securities and Exchange Act to implement this new requirement? I don't think it's disputed that the animating purpose, but the Exchange Act, right, is to facilitate the full and fair dissemination of information important to investor decision-making. That was the premise upon which the act- And there's nothing, again, I hate to interrupt. I know your time is out with the Chief's indulgence. There's nothing to prevent corporate entities or any regulated entity to publicize this type of information. If they think that investors, they want to attract investors, it would seem to me that they would want to trumpet all of their DEI efforts and anything else that investors might care about, whether it's investment in South Africa during apartheid or disinvestment, disinvestment from Israel. It seems to be the demand of some today. There's nothing to prevent entities from advertising whatever they consider to be virtuous in the market, right? That's correct, but what the record here shows and what NASDAQ found and the Commission found in the comment file is that investors find it very difficult to both collate this information and compare it across companies. And so a lot of the work that this rule does and a basis of the finding of consistency with the market-based factors in 6b-5 is that it makes the use of this information by investors more efficient and more effective. And there was ample evidence. I think we've got your argument. Thank you. Chief Judge Richmond and may it please the Court. Stock exchanges like NASDAQ have existed since the nation's founding. For 150 years before the Commission was even a gleam in Congress's eye, exchanges like NASDAQ adopted their own rules and exercised their own oversight. When Congress passed the Exchange Act in 1934, it did not federalize the exchanges. Instead, to retain the flexibility, responsiveness, and innovation that are the hallmarks of private enterprise, it gave the Commission limited oversight to ensure that the exchange's own rules are designed to be consistent with the Exchange Act. I could not have said it better than my friend on the other side, Mrs. Little, when she said that the SEC's authority in this regard is the authority to allow. So long as that standard of consistency is satisfied, exchanges can, just as they have for centuries, conceive, develop, and adopt their own rules governing the relationships they have with the companies who voluntarily choose to list on their exchanges. Unlike government regulation, this model of self-regulation isn't a one-way street. Companies can and do vote with their feet and move to another exchange. And as a result, the exchanges compete vigorously for companies' listings. It's a free-market form of regulation that has served free enterprise well, and it's why we have the most vibrant exchanges in the world. This Court should reject petitioners' attempts to turn the exchange's private action, which the Constitution protects, into government action, which the Constitution constrains. Nothing in text, history, or precedent countenance petitioners' attempt to turn private company into arms of the state, with ramifications far beyond the exchanges and self-regulatory organizations. Holding the line between private action and state action is critical because, as the Supreme Court recently explained in an opinion by Justice Kavanaugh, not policing that line would expand governmental control while restricting individual liberty and private enterprise. The petition should be denied for two reasons. First, the Constitution doesn't apply to NASDAQ's rules. Petitioners stake their case on the theory that the Commission's order approving NASDAQ's rules somehow transforms those rules into state action. But if there is one fixed star in the universe of the Supreme Court's state action jurisprudence, it is that approval by the government of private action does not transmute that action into state action. Any other conclusion would conflict with decades of precedent and vastly expand the reach of government regulation and judicial supervision into private enterprise. Second, the Commission reasonably determined that NASDAQ's rules are consistent with the Exchange Act. Increasing transparency and facilitating informed decision-making through uniform disclosures aren't just consistent with the Act. They're the cornerstones of it. Substantial evidence supports the Commission's finding that the rules are fundamentally about disclosure. Disclosure that contributes to the decision-making of a broad array of investors. And that's at JA 7 through 8. Taking off these criteria, the statutory criteria in B-5, the rules promote just and equitable principles of trade because they eliminate information disparities between large and small investors. They remove impediments to and perfect the mechanism of free and open markets because they make available on a broad scale basis information and comparable data on board diversity sought by a broad swath of investors. And they protect investors and the public interest by providing sought-after information in a consistent and easily comparable format. In sum, the SEC reasonably concluded that NASDAQ's rules are consistent with the core disclosure-related purposes of the Exchange Act. And to respond to questions from several members of this Court about limits and where do we draw the line, I would say I think there's sort of a three-legged stool in this area. The first leg is investor demand. Is this something that a broad swath of investors want? But that's not all. That's not the only limit. I think the second limit is a link to corporate performance, to corporate governance, to investor protection. And we have that here. And I think that would be the missing ingredient for several of some of the hypos that we've heard. And that evidence linking the information demanded with corporate governance, with corporate performance, with investor protection does not have to be conclusive for a reasonable investor to rely on that evidence in wanting the information at issue. And I think the third ingredient, the third limiting principle, is the evidentiary record that is placed before a reviewing court. And in this case, you have all three. Undisputed broad investor demand. Number two, you have a link to credible evidence linking the information sought to corporate performance, to investor protection, to corporate governance. And three, you have an evidentiary record that establishes those things. And I would welcome the court's question. You go ahead. Well, just a quick question. You emphasized disclosure and information and how valuable this is to investors. So why the explanation requirement? You must explain why you don't meet our goals and why the recruiting requirement? Sure. And let me take the explanation requirement first, which the way the rule will work is you have two diverse director according to the criteria that the rule sets out or you explain why. And the investors want the explanation why? Yes, absolutely they do. And there is information in the record where in comments, investors said what they want is information, both the statistical information that the matrix applies, but also information concerning a company's general approach to diversity. It also provides context, important context for the statistical information that's given in the matrix. So the explanation is really part and parcel of the information. And the record does establish that investors sought that in terms of context and additional information as well. And I'm sorry, just your second, the second part of your question was about this. We'll help you recruit diverse directors if you won't find them yourselves. This is actually a free service that is only if companies who choose to list on the exchange, if those companies choose to comply with the rule by adding to the board or seeking to, if that are some things that the company chooses to do, we are willing to partner with that company and give them a resource to help if that is the company's choice. That's coming from the company's choice to want to do that. And it's our way of saying if that's your choice, if that's how you want to comply with the rule that you're agreeing to by listing on a smart exchange, we will help you in that endeavor. Are there any limits to what information can be required in a hypothetical case in which there's a showing of fraud investor demand? Those are your words. We've thrown out a lot of hypotheticals. I'll throw out three more. One is, you know, how many of the directors subscribe to TikTok? Number two, how many of the directors support abortion? Number three, how many of the directors regularly attend services of worship? Again, assuming that the record says that investors broadly demand that information, you would have to say then that all of those questions or inquiries or requirements would be permissible under the act. No, not at all, Your Honor, because I think that gets to the second leg of the stool that we were talking about. And that is a link, a link between the information sought to corporate performance, corporate governance or investor protection. And I have a difficult time believing that a sufficient evidentiary record could be established linking any of the hypotheticals and particularly those that Your Honor suggests. Well, you're just rejecting my hypothetical, but I'm giving you a hypothetical in which it is shown that investors are intensely interested when they make their decisions in those particular facts. Yes, I'm granting you. I'm not fighting the hype, though, Your Honor, on that point. There is demand, but then there also has to be an addition to that demand, right? There has to be a link between the information that's being demanded. What is the link between sexual preference and corporate performance, governance and investor protection? Sure. So there is a wide variety of evidence in the record, both in the form of what investors told us their own experiences with Aurelion in terms of diversity in the boardroom, bringing in different voices, different experiences to bear. And so that is part and parcel of the definition that NASDAQ chose. If that's correct, then why isn't there a demonstrable link between Jewish members of the board and corporate performance or Episcopalian members of the board and corporate performance? And would NASDAQ as a private entity be allowed to promulgate a requirement of such disclosures? Your Honor, I think there are two aspects to your question. I think the first aspect of your question goes to the definition of diversity. And in this case, NASDAQ reasonably settled on a definition of diversity that largely tracks with the EEO1. So that's certainly there were different rules. I think the second aspect to your question, Your Honor, with respect to the hypos that you show, I'm not, I'm not, again, this gets me back to I think the second limitation, which is critical, which is it's not just investor demand, although investor demand is important. It is also a demonstrated link to corporate governance, corporate performance, and investor protection. Your Honor, I'm not aware of any evidence linking that. Certainly, certainly, well, you would have to develop a choice versus pro-abortion. It does have very differing views. And I think you could probably find a link between those differing viewpoints that investors want to know. And they could link it up to performance. But is that a legitimate? I think, I think that's kind of, that's where the third, prong of the stool, or leg of the stool comes in, and that investor demand, a link to corporate performance, governance, or investor protection, and then an evidentiary record that provides substantial evidence of that. And I, Your Honor, I do have a difficult time believing that a sufficient evidentiary record could be compiled. And if in all events, all of the hypos today show up the difference, the disparity between the record that would be needed to, in those cases, and the record that, for how to, Quick question. Sorry to interrupt you. But let's talk about, I'm interested in the evidentiary record point that you're making. So help me in the record. Let me, let me just start with something that's much more sort of, within common experience, as opposed to whether I'm Episcopalian or not. Female, that's one of the prongs here. What does the record show about how having at least one female on the board contribute to corporate performance? Because I imagine if I dug through the record, I would find something that speaks to that. What would I find? Sure. And let me just, let me just go through, in terms of what's in the record, in terms of, in terms of, Well, female. I want to focus on female. Yeah, certainly. And some of these, some of these focus, I mean, in terms of a lot of the studies are looking more, more generally. They're not solely focused on female, although there is, there is evidence in the record. So I would point your honor to, actually, the Chamber of Commerce relied on the 2019 PwC survey about, of directors, about the value of a diverse board that directs your, that contains analysis. That's what I'm getting at, is what do women bring to the corporate governance? I mean, I believe they do. Don't, don't get me wrong. What do, but what does the record say that a woman brings to corporate governance, such that a rule saying, tell us how many women on your board is consistent with the exchange? Yes, there, there, there is, there is evidence in the record that women, we look at the numbers of women on corporate boards, you find improvements and differences, particularly with respect to corporate governance and investor protection issues in terms, in terms of making sure T's are crossed, I's are dotted. That information is, is in the record. Now, again, the SEC did not rely on that evidence in terms of, of, I figured as much. So then my question is, the definition of female in this rule is not, it is an individual who self-identifies her gender as a woman without regard to the individual designated sex at birth. So is there evidence that shows that people who aren't women, but who self-identifies women add to corporate governance? I'm not aware of any information going directly to that, but there is certainly information in the record with respect to women, people who are female, and I think again, one reason why I think the SEC reasonably did not rely on that in justifying the rule and on the disclosure aspect is it recognized that, that, that information is, it is, it is inconclusive. It's part of the debate. And rather than wade into that debate, the SEC made the reasonable decision that it was going to justify the rule in the record on the disclosure aspect of the rule. And the way that that information thought it's consistent with the purposes of the act, and that, that is the, that is the rationale before, before this court. Two quick questions. Does the proposed rule arbitrarily privilege diversity of sex over diversity of race, sexual orientation, and gender identity because it requires diversity of sex and treats the other three categories interchangeably? That's what one of the amicus argues. That's one question. And then the second, do you want to answer that one first? Or do you want me to, I'll give you both. And then the second one is the, is a related hypothetical about for good governance, you say we want to have an equal number of people who voted for President Trump and President Biden because we think that's helpful for governance and relations with political actors and it might benefit our company. And there's very much in, can you have that rule? And can you have Judge Englehart about fidelity with your spouse, regardless of who that spouse may be? My answer to both is the same and to any variation of the hypothetical. It's both investor demand, number one. It is a link to corporate governance, performance and relations and information and evidence which can be in the form of- But that's easy on political. Backing up that link. And I'm not aware of any evidence. And frankly, I would be surprised if there were evidence linking those characteristics to corporate governance, performance- Fidelity to your spouse, whoever your spouse is, it's not. But anyway, can you answer the first question about whether it's arbitrary and capricious because it treats some categories different than others. Sexual orientation and race in one group and sex in another. No, Your Honor, I don't think it does. I think it was not arbitrary and capricious to- And certainly there could be different rules that one would imagine that would make different choices, but I don't think it was unreasonable for NASDAQ's rule to choose. In part, that's based on analysis done in the studies that we rely on, the Carlisle Group, MFCI and others that situated kind of the one to three numbers in that. And there was nothing arbitrary and capricious about that. It was also grounded in evidence and was credible. And again, that's not to say that it would be unreasonable to adopt a different rule because the question- I think, Judge Oldham, this goes back to some of the questions you were asking, right? Which I think highlights the difference between the standard that the statute applies to NASDAQ's rules, to private companies' rules, and the standard that the statute applies to the government, to the SEC. When the SEC regulates, it has to be necessary to further the goals of the act. When we make our own rules and the SEC is approving our own rules, the question is simply, are they consistent with the act? And so you could easily imagine a situation where exchanges can and do. That's the beauty. That's a feature, not a bug of the private system. But counsel, you agree. You agree that the SEC has to have a basis in Section 6B-5 to justify this because that's the only thing they said in the approval order. Like, we can talk about Section 6B-8 all day. We agree that it's 65 and it's B-8, or the two. The 65 lists out the things, the various things that have to be consistent with. So we don't have any disagreements. Do you have a position on whether New York Stock Exchange, like, how in the world they can't have a 6B-5 rule that you are required to have? Sure. Well, let me- We are not required to have that rule. As the SEC said, we will not stand in your way of having this rule because it is consistent with the Exchange Act. Can you think of another area where there's a Section 6B-5 requirement that's just optional, that you can have it and the NYC can't? I can understand that, but please, I hear you on Section 6B-8, right, but I don't understand you on 6B-5 because on 6B-5, those are things that are part and parcel of being registered as an exchange. You have them or you don't. You either promote fair markets or open markets or investor protection or public interest or you don't. Right. I think my answer to that would be, I can imagine- Well, let's take an example on the record, right? The long-term stock exchange, it has a policy as part of its rules about- it wants to know about its listed company's diversity efforts. All right? NASDAQ has a different rule. The fact that the exchanges are allowed to find different ways to be consistent with the Exchange Act is precisely why Congress did not federalize the exchanges, right? Well, I think- Because the whole point is to allow those- Thank you for adequately answering the question. Thank you, Your Honor. Thank you. Would you please give Mr. Berry time? And Ms. Little's time, about three minutes or so. Your Honors, this rule fails NASDAQ's own test. I'm going to read to you from the SEC's authorization order. This is at page nine of the joint appendix. Quote, Studies of board diversity mandates in any event do not provide a reliable basis for evaluating the likely overall effects of the board diversity proposal. NASDAQ says that these rules rest on this three-legged stool that we just spent some time talking about. So we just talked about the lack of a reliable connection. We just talked about the SEC's own finding disclaiming the purported evidentiary basis here. But then another one of these test elements that NASDAQ has put forward is not in the statute. And that is this whole concept of investor demand. At best, investor demand is potentially evidence that a rule is in furtherance of investor protection, which is the actual standard enumerated in 6B5 and FB5. For further discussion of this, it really talks about how thoroughly investor demand can fall short. I would direct the court to Professor Sean Griffith's amicus brief, pages 16 and 17, in particular, that dovetails very nicely with Judge Ginsburg's observation in the second business roundtable case that we look through the stated interests of the investors who clamor for this or that mandate and examine their real motives, their real purposes, which again align with NASDAQ's own stated purpose, which again is the allocation of board seats and investment capital on the basis of directors' race and sex and sexual orientation. A few other things that come out from this, I think this is why the court is grappling with the issue so much, is investor demand opens the door to inquiries on the basis of religion or political affiliation, that being something that the D.C. Circuit in the NAM case was very critical of. It would also, simply because people want to know, simply because there is maybe, just maybe, the creation of an orchestrated pressure campaign emanating from one sector, often highly unrepresentative of the community of investors. What we don't have here is evidence of the reasonable investor. NASDAQ's counsel alluded to that, which of course is an articulation of materiality as a requirement. We don't have evidence of that and we don't even have empirical evidence when it comes to some sort of broad-based survey of what mom-and-pop retail investors actually want. Instead, we have asset managers like State Street who are giving stated evidence in contrast to their fiduciary duties of maximizing their own retail investors' value when they talk about diversity inclusion as goals for their own sake. I think that Judge Higginson was onto something when he identified similarities between the subject matter of this rulemaking  I think this court has also briefly had to consider a parallel with the SEC's encroachment into the realm of the EPA in the climate case before that was transferred to the Eighth Circuit and we see something similar here. So there's not a lot left, frankly. Investor demand left in itself is really nothing more than a demand for more information and information, as Professor Griffith points out, can be helpful for investor protection. It can also be harmful. This is information that in the hands of the asset managers and proxy advisors who are clamoring, who've actually put themselves out there, the labor unions who've requested this information, we have record evidence they would be using this in furtherance of pursuit of collateral social interests, collateral ESG-type interests rather than in pursuit of shareholder value. And we know this because the SEC, again, disclaimed that there is a reliable basis for that connection between this kind of identity politics-based diversity, categories, and anything resembling actual shareholder value. Has NSEC promulgated any other rules that are in any way comparable to this one? The short answer is no, Your Honor. There is nothing like this. There were citations in the briefs about arbitration regulations or independent boards of auditors, about independent directors, but nothing that goes into race, religion, or political categories. Not even remotely like this. They're way out of their skis on this as a matter of law. What about 17 CFR 2229.407 about diversity in making director nominations that the SEC already has? So this is, I believe, Judge Arrowhead, you're referring to the SEC's old rule on this from about 2009. The critical difference in that regulations case is that the SEC did not purport to define diversity. And indeed, it deals with the wide scope, all the concepts of diversity that have been bandied around here, as opposed to NASDAQ, which is here to define diversity specifically along the lines of these often controversial categories of race and sex. Thank you. I'd like to make four points on rebuttal. First, in answering Judge Jones' last question about the examples given by the SEC that go to the word governance.         for us to be able to talk about, and I think that's a good point for us to be able to talk about. Is there a conflict of interest of the directors, independent boards? Not a single one of the examples given by the SEC pertains to anything else. And so those are distinct interests that are fine to protect under these laws, as opposed to the rules we're dealing with today. And to the extent my friend, an opponent said, I had said something about authority to allow. There must have been a missing, no authority to allow from what I said earlier. So I'd like to correct that. This is not a free market system and information at all. These disclosures have the government's imprimatur on it, and that is impermissible under the terms of Rule 65, unless it advances the purposes of the act, which these do not. I was also struck by how much attention was paid to corporate governance, which seems to me to be a pretty dangerous place for the SEC or NASDAQ to tread, because Business Roundtable tells you that when you go to issues far beyond anything having to do with board integrity, it is very clear that the Exchange Act does not tread on corporate governance and management or practices of self-regulatory organizations. That is concededly a part of corporate governance, traditionally left to the state, and including the statement by former Commissioner Grunfest, quoting from the Business Roundtable case, the 34 Act does not give carte blanche to adopt federal corporate governance standards through the back door by mandating listing standards. My opposing counsel also referred to a fixed star. I think the only fixed star this Court should be considering in this matter is that there shall be no orthodoxy imposed by government on what people must say or think in these realms. Also, the SEC has the power to abrogate change or alter these rules, and so is very much involved with these rules. It places its infirmature on it. There are penalties. One of the penalties is you must explain yourself. Again, in some of the briefings, there's a list of what are acceptable explanations. That only makes it worse because that's government-scripted speech, and your right to remain silent means there's a penalty. I would maintain that under the Supreme Court cases of Hurley and Riley and the various presidents which defend Americans' right to remain silent on such questions, certainly the SEC has no business participating in a scheme that forces you to speak. My final point is that if the Court finds the 6B-5 treaty forbids this rule as it does under its express terms, there is no reason to reach any constitutional issue or state action issue. Thank you, Counselor. Thank you. Court will stand adjourned until 9 o'clock in the morning.